UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

HOPE MELINDA WINTERS-BAKER,

     Plaintiff,

v.                                              Case No. 3:14cv359/CJK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

_____/

## MEMORANDUM ORDER

     This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Hope Melinda Winters-Baker's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in this case, including entry of final judgment.  Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and both applications for benefits will be denied.

ISSUE ON REVIEW

Ms. Winters-Baker, who will be referred to as claimant, plaintiff, or by name ("Winters-Baker"), raises one issue on appeal, arguing the ALJ erred in assigning weight to the opinions of various physicians.

PROCEDURAL HISTORY

Claimant filed her applications for DIB and SSI on January 6, 2011, alleging disability beginning on April 1, 2009. T. 164-66.[1]  Plaintiff's claims were denied initially on April 18, 2011, and on reconsideration on August 3, 2011. T. 85-105. After filing a request for a hearing, claimant appeared before an Administrative Law Judge ("ALJ") on November 29, 2012. T. 47-68, 106-07. On March 7, 2013, the ALJ issued a decision denying plaintiff's claims for benefits. T. 17-46. Claimant petitioned the Appeals Council for review of the ALJ's decision. T. 14-16. The Appeals Council denied claimant's request; as a result, the ALJ's decision became the final determination of the Commissioner. T. 1-6.

FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relative to the issue raised in this appeal:

• "The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged disability onset date. (20 CFR 404.1571 *et seq*.)." T. 22.

---

[1] The administrative record, as filed by the Commissioner, consists of fifteen volumes (docs. 7-2 through 7-15) and has 967 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

• "The claimant has the following severe impairments: Seizure disorder, migraine headaches, Chiari I malformation[2], degenerative disc disease of the cervical and lumbar spine, post-traumatic stress disorder (PTSD), and depressive disorder, NOS. (20 CFR 404.1520(c) and 416.920(c))."  T. 23.

• "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)."  T. 29.

• "[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffold, she can never tolerate exposure to unprotected heights and dangerous equipment, and she can never operate a commercial vehicle.  With respect to concentration and reasoning, the claimant is able to attend and concentrate for two hours at one time before needing a break, she is able to adapt to occasional changes in work settings and routines, she is able to understand, remember, and carry out [sic] short, simple work instructions, she is able to make good judgments regarding simple work-related decisions, and her time off task can be accommodated by normal breaks. Additionally, the claimant is able to tolerate occasional contact with the public, co-workers, and supervisors."  T. 31

• "The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  T. 37.

---

[2] Chiari I Malformation occurs when brain tissue overextends into the spinal canal, causing headaches and balance issues.

• "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))."  T. 38.

• "The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of th[e] decision   (20 CFR 404.1520(g) and 416.920(g))."  T. 39.

STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).  Even if the evidence preponderates

against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, re-weigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).   A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."  *See Flynn v. Heckler*, 768 F.2d. 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot,

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)-(g) and 416.920(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not  performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.[4]

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates claimant's residual functional capacity and vocational factors, she is not disabled.

"[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[5]  20 C.F.R. §§ 404.1545(1) and 416.945(1).  The ALJ

---

[4] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir.  1986).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity.  We will assess your

establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[6]  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

---

residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] "Before we go from step three to step four, we assess your residual functional capacity.  (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

Case. No. 3:14cv359/CJK

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[7]

Ms. Winters-Baker is a high school graduate with previous relevant work experience as a victim's advocate for battered women.[8]  T. 51-54.  At the time of the hearing, plaintiff lived with her husband and two children.  T. 56-57.  She drove occasionally and was able to prepare meals for herself and visit the local flea market.  T. 57-58.  She testified she was disabled and could no longer work.  Specifically, claimant testified that she "tried to keep working," but could no longer continue due to "pain all over," muscle fatigue,  and numbness in the left side of her body.  T. 51-58.  Plaintiff bases her disability claim on seizures, post-traumatic stress disorder ("PTSD"), nerve damage, thyroid disorder, Chiari I Malformation, depression, Todd Martin Syndrome,[9] and headaches.  T. 196, 318-19.  Although plaintiff has a myriad of health complaints, the objective medical findings are scant despite significant treatment and testing.

I.      PTSD and Depression

From 2003 to 2006, claimant had "sporadic" visits to Lakeview Center reporting symptoms of PTSD and depression and seeking medication management.  T. 310-42.  She attributed the symptoms to severe domestic abuse by her ex-husband and a "rough" childhood during which she both was physically abused by her mother and witnessed the physical abuse of her mother by her father.  T. 310-42, 390-93.  In

---

[7] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record.  Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

[8] Plaintiff had other, part-time work, primarily in retail and the restaurant business.  She was terminated from at least two retail jobs for theft, with the last termination occurring on April 9, 2009.  T. 191, 313, 712.  She allegedly stopped working on July 1, 2009, because of her condition.  T. 191.

[9] Todd Martin Syndrome is associated with migraine headaches, anxiety, and perceptual issues usually caused by lack of sleep, abnormal blood flow to brain, or brain tumors.

March 2009, plaintiff returned to Lakeview Center and saw Dr. Kaberi Samanta, a psychologist, complaining of anxiety caused by her relationship with the abusive ex-husband, feelings of depression, and sleep difficulty.  T. 310-11.  She took Lexapro for depression and PTSD.  She also consumed alcohol to help her sleep.  T. 310-11.  Dr. Samanta diagnosed PTSD and major depressive disorder.  T. 313-14.

Dr. Stephen Hirschorn, a psychologist, also diagnosed PTSD and major depression in April 2011.  T. 390-93.  Claimant reported to Dr. Hirschorn that in order to escape her abusive ex-husband, she moved and changed her name and social security number.  She stated that all of these factors caused her to feel "'rattled, nervous, scared, and depressed.'"  T. 391.  Dr. Hirschorn assigned a GAF score of 45 and noted a "significant gait disturbance."[10]  T. 390-92.  Dr. Hirschorn also noted claimant could take care of herself and was alert, coherent, and fully oriented.  T. 392.

Ms. Winters-Baker also was assessed by Dr. Deborah Carter, a state agency psychological consultant, in April 2011.  Dr. Carter completed a Psychiatric Review

---

[10] The GAF rating has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed., text rev., 2000).  A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning;" a GAF between 61 and 70 indicates "mild" symptoms or "some difficulty in social, occupational or school functioning," but "generally functioning pretty well;" a GAF score between 71 and 80 indicates transient and expectable reactions to psychosocial stressors and no more than an slight impairment in social, occupational, or school functioning; a GAF score between 81 and 90 indicates no or minimal symptoms and good functioning in all areas.  *Id.*  The most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

Technique Form, diagnosing major depressive disorder and PTSD with "moderate" difficulties in concentration areas but "mild" difficulties in activities of daily living and mental functioning.  T. 398-410.   A Mental Residual Functional Capacity Assessment completed by Dr. Carter showed no significant limitation in plaintiff's ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions.  T. 394. Dr. Carter indicated a moderate limitation in claimant's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  T. 394-95.  According to Dr. Carter, plaintiff had no significant limitation in the ability to interact appropriately with the general public, ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  T. 395. Dr. Carter noted, however, that plaintiff could not travel independently because of her seizure disorder.  T. 396.  Dr. Carter concluded that plaintiff "retain[ed the] capacity to function mentally and socially to perform [activities of daily living] and to interact

appropriately with others" and opined that plaintiff "appear[ed] capable of performing [simple routine repetitive tasks] in a work setting." T. 396.

The following month, Dr. George M. Dmytrenko, a neurologist, filled out a Supplemental Mental Impairment Questionnaire. T. 586. Dr. Dmytrenko stated he did not believe plaintiff suffered from a mental impairment that significantly interfered with her daily functioning. T. 586. During a mental status evaluation with Dr. John F. Duffy, a psychologist, claimant reported having PTSD. T. 711. Dr. Duffy described plaintiff as having a "slow gait." T. 711. With respect to mental functioning, Dr. Duffy noted claimant was alert, oriented, and cooperative and that her thought processes were organized and goal-directed. T. 712. Dr. Duffy also indicated that plaintiff's immediate attention was below average and that she had limited concentration but adequate short-term memory. T. 712. Dr. Duffy diagnosed PTSD and "Depressive Disorder NOS," assigned a GAF score of 50, and gave a "poor prognosis for recovery due to multiple physical problems." T. 710-13.

In July 2011, plaintiff visited Lakeview Center for a psychosocial assessment. T. 955-60. The assessment notes indicate an intact memory, normal speech and motor activities, fair attention and concentration, and that claimant was oriented. T. 958. The notes also indicate plaintiff had problems remaining employed and that employment was a goal of hers. T. 957. She again was diagnosed with PTSD. T. 959.

II.   Abdominal Pain from Hysterectomy

Claimant testified she became disabled after a radical hysterectomy in 2005, when the incision failed to close requiring that mesh and titanium screws be inserted. T. 54. The procedure resulted in nerve damage, according to plaintiff, and pain that caused major discomfort in the abdomen, as well as difficulty bending over, turning

her body, and digesting food.  T. 54-55.  In order to alleviate the effects of the surgery, Dr. Ludovic Lasquety performed an incisional hernia repair in July 2007. T. 285-86.  Upon plaintiff's request, in January 2009, Dr. Lasquety released her to return to work with no restrictions.  T. 273.

Complaining of enlarged lymph nodes, claimant visited The Surgery Group in June 2010 and saw Dr. Jonathan Lohrbach.  T. 368-69.  Claimant reported abdominal pain and weakness and dizziness all over.  T. 368.  Dr. Lohrbach noted plaintiff's abdominal region was soft, nondistended, and non-tender, with a "well healed midline incision."  T. 369.  A CT scan nevertheless was performed  T. 369.  Dr. Lohrbach concluded the "[c]omplaints of diffuse pain with suspected enlarged lymph nodes [were] not verified by [his] examination or CT scan."  T. 369.

According to plaintiff, however, the pain persisted.  She had an upper endoscopy and esophageal dilatation on May 2, 2011.  T. 630.  The tests revealed a "[s]emi-circumferential, minimally obstructing distal esophageal Schatzki ring," minimal hiatal hernia, and mild gastritis.[11]  T. 630-31.  She also had a colonoscopy, which yielded normal findings and an unremarkable biopsy.  T. 633, 635-36.  A CT scan of the abdomen and pelvis was performed on May 30, 2011, due to right-sided back pain, flank pain, and a history of colitis.  T. 601.  The scan showed no evidence of ileitis or colitis.  T. 601.  The following month, claimant visited Dr. Wayne Adkisson, a gastroenterologist, for abdominal pain.  Lab work was performed, along with a CTA and ultrasound of plaintiff's abdomen and gastric emptying.  T. 785-94. All tests came back essentially normal.  T. 785-94.

---

[11] A Schatzki ring is a "narrowing of the lower esophagus that can cause difficulty swallowing (dysphagia)."  https://en.wikipedia.org/wiki/Schatzki_ring.

III.    Neck, Shoulder, Back, and Head Pain

In February 2010, Ms. Winters-Baker reported enlarged lymph nodes and pain in the left side of her shoulder, chest, and neck.  T. 345-46.  Radiographs and an EKG were normal.  T. 346-48.  As mentioned above, plaintiff continued to complain of diffuse pain and enlarged lymph nodes, but a CT scan and physical examination failed to verify her complaints in that regard.  T. 353, 368-69.

Due to complaints of head pain, claimant had an MRI on September 24, 2010, and was diagnosed with Chiari I Malformation.  T. 376.  The MRI otherwise was unremarkable.  T. 376.  She then visited her family physician, Dr. Darrel Pugh, who completed an Application for Disabled Person Parking Permit Placard on her behalf.  T. 925.  On the form, Dr. Pugh indicated that claimant had a "severe limitation in her ability to walk due to an arthritic, neurological, or orthopedic condition."[12]  T. 925.  Because of alleged neck pain, plaintiff had an MRI of the cervical spine on October 29, 2010.  T. 525.  The test showed slight bony protrusions and slight disc dehydration, but was negative for signs of encroachment.  T. 525.

Complaining of back pain and headaches, claimant visited Dr. Dmytrenko in November 2010, upon Dr. Pugh's referral.  Dr. Dmytrenko ordered a cervical EEG, which yielded normal results.  T. 486.  After continued severe headaches and back pain, claimant returned to Dr. Pugh, who ordered x-rays and an MRI of the lumbar spine.  T. 501, 514, 520.  The x-rays, performed on December 1, 2010, revealed "[n]o acute or advanced degenerative changes," T. 514, and the MRI, performed on December 13, 2010, revealed "[m]ild disc space degeneration L3-4 and, to a lesser extent L5-S1 . . . [m]inor disc bulge at L3-4, but no significant narrowing of the central canal or of the neural foramina."  T. 501.

---

[12] The handicap evaluation form did not define "disability."
Case. No. 3:14cv359/CJK

In July 2011, Ms. Winters-Baker visited Dr. Michael E. Kasabian for a physical health examination in connection with her application for disability benefits.  T. 642-47.  According to Dr. Kasabian's assessment, plaintiff had normal strength, obtaining a 4/5 for lower and upper extremities on her right side and a 5/5 for lower and upper extremities on her left side, along with negative straight leg raising.  T. 644.  A little more than a year later, she visited Dr. Lori Stuart for "[a]bnormal movement."  T. 882.  Dr. Stuart noted plaintiff was moving around with no visible problems walking or talking.  T. 882-83.  Dr. Stuart also noted that while plaintiff claimed to have had a brain tumor, a "CAT scan was normal, with no signs of an craniotomy or neurosurgery in the past."  T. 882.  According to Dr. Stuart's notes, "[p]sych [had] been consulted to see this patient," which Dr. Stuart thought would be beneficial to plaintiff.  T. 882-83.

Claimant subsequently saw Dr. Pugh multiple times for various complaints of pain.  T. 892-924, 935-53.  Dr. Pugh ordered numerous tests, all of which yielded negative results and no significant findings besides tenderness in extremities on one occasion and findings consistent with Chiari I Malformation.  T. 520, 892-924, 935-53.  On August 5, 2012, Dr. Pugh noted normal gait and station as well as muscle strength and tone.  T. 938.

IV.    Seizures

Ms. Winters-Baker says she began having seizures in November 2009.  T. 54-55.  A year later, and again upon Dr. Pugh's referral, she visited Dr. Dmytrenko for treatment of the seizures.  T. 486.  Dr. Dmytrenko ordered an EEG, which yielded normal results.  T. 486, 519.  Another EEG was performed one week later and also yielded normal results.  T. 518.  According to physicians' notes and blood test results, at times, plaintiff took no seizure medication or subtherapeutic dosages thereof.  T.

569-70, 576, 585, 828-29, 832, 865, 908.  She indicated to Dr. Dmytrenko on January 27, 2011, that she could not afford the medication and thus was not taking the proper dosage.  T. 576.

On May 11, 2011, plaintiff was admitted to the hospital for a reported seizure.  T. 567.  The next day, she saw Dr. Dmytrenko, who noted it was "[v]ery unclear what these spells are like," but that they were not "generalized seizures."  T. 567.  Claimant was admitted to the emergency room at Baptist Health Care on July 16, 2012, for another alleged seizure.  T. 860-63.  Two days later, on July 18, 2012, she had an MRI, which revealed findings "consistent with [claimant's] given history of Chiari I malformation," but no "hydrocephalus . . . areas of vasogenic edema or mass effect . . . enhancing legions . . . or areas of acute ischemic change. " T. 929.  When she saw Dr. Stuart that same day, Dr. Stuart characterized the seizure disorder as "questionable."  T. 882.  On July 23, 2012, an EEG showed normal results.  T. 928-29.  Nerve conduction studies also were performed, yielding "no definitive electrophysiologic evidence of a diffuse peripheral neuropathy affecting the bilateral lower extremities," "no electrophysiologic evidence of a left  lumbosacral radiculopathy," "no definitive electrophysiologic evidence of a diffuse peripheral neuropathy affecting the bilateral upper extremities," and "no definitive evidence of a right cervical radiculopathy."  T. 965-67.

<u>ANALYSIS</u>

Claimant raises one issue on appeal, asserting the ALJ failed to assign the proper weight to physicians' opinions.  She argues: (1) the ALJ erred in giving no weight to Dr. Pugh's opinions on the handicap parking form; (2) the ALJ erred in assigning great weight to Dr. Dmytrenko's opinions on the Supplemental Impairment Questionnaire; (3) the ALJ erred in assigning great weight to Dr. Carter's opinions;

and (4) the ALJ failed to specify with particularity the weight given to Dr. Hirschorn's and Dr. Duffy's opinions.

When determining a claimant's residual functional capacity ("RFC"), the ALJ weighs all of the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 416.920(e). Although doctors' opinions and notes are taken into consideration, the ALJ must independently determine the claimant's RFC. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010). When deciding the weight to give to a particular medical opinion, the ALJ must consider a number of factors, including: (1) whether the doctor giving the medical opinion examined the claimant, (2) whether the doctor giving the opinion treated the claimant, (3) the evidence the doctor presents to support his or her opinion, (4) whether the doctor's opinion is consistent with the record as whole, (5) if the doctor specializes in a certain field, and (6) other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

When a treating physician's opinion regarding a claimant's condition is bolstered by medically acceptable clinical techniques and is consistent with the other evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Opinions by a treating physician on issues reserved for the Commissioner, however, are not entitled to controlling weight. SSR 96-5p, 1996 WL 374189 (Jul. 2, 1996). The Commissioner also is not bound by a treating or examining physician's opinion when "good cause" exists to reject it. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 1986). "Good cause" is present where: (1) the treating physician's opinion is not supported by the evidence; (2) the evidence contradicts the treating physician's opinion; or (3) the treating physician's opinion is conclusory or inconsistent with the

doctor's own medical records.  *Phillips*, 357 F.3d at 1241.  When "good cause" is present, the ALJ must clearly articulate reason(s) for disregarding the treating physician's opinion.  *Phillips*, 357 F.3d at 1241.  *Phillips*, 357 F.3d at 1241.  Failure to do so is reversible error.  *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)); *see also Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x. 589, 591 (11th Cir. 2006).

I.      Dr. Pugh

        Plaintiff claims the ALJ erred by assigning no weight to the application for a Disabled Person Parking Permit Placard filled out by Dr. Pugh – specifically, the portion of the application that indicated claimant had a severe limitation in her ability to walk and could not walk 200 feet due to an "arthritic, neurological, or orthopedic condition."  T. 925.  The ALJ discounted Dr. Pugh's opinion because a significant portion of the opinion was contradicted by Dr. Pugh's own treatment records and other evidence in the record.  Indeed, no medical evidence of record substantiates an arthritic, neurological, or orthopedic condition that limited plaintiff's ability to walk.  T. 273-967.  Although claimant may have had degenerative disc disease, as the ALJ observed, the record provides no evidence of limitations in her lower extremities, particularly to the extent assessed by Dr. Pugh.  T. 34.  In fact, a September 4, 2012, nerve conduction study indicated an absence of any such limitations, T. 965, and x-rays and MRIs of her spine showed no significant narrowing of discs, acute or advanced degenerative changes, or other abnormalities  T. 501, 514, 918.  Images of plaintiff's knees showed only minimal osteophytic spurring and no acute skeletal abnormality, and images of her hips showed no acute radiographic abnormality.  T. 915-17, 919.  Dr. Pugh mentioned tenderness in claimant's extremities on only one occasion.  Significantly, before he filled out the application, Dr. Pugh had never

imposed any limitations on claimant, whether arthritic, orthopedic, or neurological, and the record reflects no such limitations imposed by any other medical provider. T. 893-903, 942-46.

In rejecting Dr. Pugh's opinion, the ALJ also noted the form did not define "severe limitation" or "disability," thereby "leav[ing] interpretation of the terms to the physician's discretion."  T. 34.  The ALJ concluded "Dr. Pugh's opinion simply [could not] be compared directly with the walking and standing requirements of light work."  T. 34.

Overlooking the inconsistencies in Dr. Pugh's records, claimant argues the opinion expressed on the parking permit application is consistent with the opinions of one-time examining psychologists Dr. Duffy and Dr. Hirschorn, who noted, respectively, that claimant "walked with a slow gait and a pained expression" and had "a significant gait disturbance . . . as she attempted to climb a flight of stairs." T. 392, 711.  Claimant neglects to mention the findings of Dr. Stuart, a neurologist, who noted claimant had a "normal gait" and could stand with no problems.  T. 932. Claimant also fails to acknowledge the repeated references in the record to her having full or near full strength in all extremities and normal motor functions.  T. 642-47, 930-32.  In any event, "a significant gait disturbance" does not equate to, or even suggest, an inability to walk 200 feet.

Also not acknowledged by plaintiff, Dr. Duffy and Dr. Hirschorn, upon whom claimant relies to bolster Dr. Pugh's opinions, are psychologists who made subjective observations of claimant's gait.  They did not administer any physical strength testing.  Dr. Stuart and other medical providers who physically examined claimant's strength recorded normal results.  Dr. Stuart's observation of plaintiff's "normal gait" came after Dr. Pugh filled out the disabled driver parking application, showing that

claimant did not later develop the suggested "gait disturbance." T. 925, 930-32. In short, the ALJ's decision to assign no weight to Dr. Pugh's opinion on the disabled driver parking form is supported by substantial evidence.[13]

## II.   Dr. Dmytrenko

Plaintiff claims the ALJ erred in assigning great weight to Dr. Dmytrenko's opinion on the Supplemental Impairment Questionnaire. Dr. Dmytrenko treated claimant from November 2010 through July 2012. T. 486, 518-19, 586. During the course of treatment, Dr. Dmytrenko ordered multiple EEGs, all of which yielded normal results. T. 486, 518-19. Dr. Dmytrenko also completed a "Supplemental Mental Impairment Questionnaire" stating claimant did not suffer from a mental impairment that *significantly* interfered with her daily functioning. T. 586. Dr. Dmytrenko's conclusion on the questionnaire is consistent with his treatment records, as well as the evidence as a whole, which show plaintiff to be oriented and to have adequate memory, a fair attention span, and fair concentration. T. 958-59. Dr. Dmytrenko nevertheless recognized claimant's limitations, including the amount of time claimant could work, as well as height and machinery restrictions. Because Dr. Dmytrenko's opinion is supported by substantial evidence in the record, the ALJ did not err in assigning it great weight.

---

[10] The disabled driver parking application was a pre-printed check-off form. Where an opinion, even that of a treating physician, is offered on a form that does not detail evidence in the record supporting the work-related limitations identified, such opinion will not bind the Commissioner. *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))).

Case No. 3:14cv359/CJK

III.    Dr. Carter

Plaintiff asserts the ALJ erred in giving great weight to the opinion of Dr. Carter, a state agency consultant.  In determining the weight to be afforded Dr. Carter's opinion, the ALJ noted he is a state agency psychological consultant with the Social Security Administration.  As recognized in the regulations, state agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1527(e)(2)(I).  Under the applicable law, an ALJ may rely upon, and must consider, the opinions of state agency consultants. *See* 20 C.F.R. § 404.1527(e)(2); *see also Voronova v. Astrue*, 2012 WL 2384414, *4 (M.D. Fla. 2012) (acknowledging that ALJ is required to consider opinions of non-examining state agency medical and psychological consultants).  Specifically, although not bound by such opinions, the ALJ "must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . . ." 20 C.F.R. § 404.1527(e)(2)(I).

When considering the findings of a state agency medical or psychological consultant, the ALJ will look to factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).  The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant, rather than to a treating source, the ALJ must explain the weight given to the opinion, just as with other medical sources.  *Id.; see Milner v.*

*Barnhard*, 275 F. App'x. 947, 948 (11th Cir. 2008)  (holding that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants).

The ALJ gave great weight to the opinion of Dr. Carter, finding it consistent with the record as a whole.  In the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, Dr. Carter noted PTSD and depressive disorder, along with various "mild" to "moderate" difficulties in performing various concentration tasks. T. 394-96, 398-410.  Dr. Carter nevertheless concluded claimant could understand and perform simple, repeating tasks in a work setting. T. 396.  Dr. Carter's opinion is consistent with the other medical evidence of record substantiating repeated diagnoses of PTSD, depression, and functional limitations while still showing claimant's functional mental ability. T. 391-92, 642-44, 710-13.  Dr. Duffy and Dr. Hirschorn, for instance, noted claimant was alert, coherent, and had an organized thought process. T. 392, 710-13.  Dr. Dmytrenko stated claimant did not have a mental impairment that significantly impaired her normal functioning. T. 586.  Considering that the record as a whole supports Dr. Carter's opinion, the ALJ's decision to give it great weight was supported by substantial evidence.

IV.    Dr. Hirschorn and Dr. Duffy

As her last assignment of error, plaintiff argues the ALJ failed to specify with particularity the weight given to the opinions of Dr. Hirschorn and Dr. Duffy.  Although the doctors noted claimant had a gait disturbance and poor likelihood to significantly improve, they also noted claimant was alert and had coherent mental functioning. T. 390-93, 711-13.  Federal regulations provide that every medical opinion in the record *should* be evaluated.  20 C.F.R. §§ 404.1527(c), 416.927(c); *Ricker v. Comm'r of Soc. Sec.*, No. 5:13-cv-479-Oc-18PRL, 2014 WL 6610849, *3

(M.D. Fla. Nov. 21, 2014) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)) ("The ALJ must state with particularity the weight given to different medical opinions, including non-examining state agency physicians, and the reasons therefor."). "[W]hen the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' [the Eleventh Circuit Court of Appeals] will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" *Winschel*, 825 F.3d at 1179 (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Failure to clearly express the weight given to the opinion's of examining physicians, however, is not automatic grounds for reversal. *See Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 (11th Cir. 2013) (citing *Ware v. Schweiker*, 651 F.2d 408, 412-13 (5th Cir. Unit A 1981)) ("We have also declined to remand for express findings when doing so would be a 'wasteful corrective exercise' in light of the evidence of record and when no further findings could be made that would alter the ALJ's decision."); *Ricker v. Comm'r of Soc. Sec.*, No. 5:13-cv-479-Oc-18PRL, 2014 WL 6610849, at *7-8 (M.D. Fla. Nov. 21, 2014) (finding ALJ's failure to assign weight to examining doctor's opinion to be harmless error when ALJ examined the doctor's findings and determined they were consistent with a treating physician's opinion that was rejected). In other words, failure to state with particularity the weight given to an examining physician's opinion can be harmless error. *See* FED. R. CIV. P. 61; *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine to a Social Security appeal and explaining courts will disregard any errors or defects in a lower tribunal that "do not affect any party's substantial rights.").

In this case, the ALJ's failure to specify the weight given to the opinions of Dr. Duffy and Dr. Hirschorn is harmless error. The ALJ plainly was aware of and

considered the opinions, as she noted the conclusions of Dr. Carter were "consistent with and supported by" the opinions of Dr. Duffy and Dr. Hirschorn.  T. 33.  Dr. Duffy and Dr. Hirschorn indicated claimant was alert, coherent, cooperative, and had an organized thought process.  T. 390-93, 711-13.  Dr. Carter made similar findings, noting claimant could understand and perform simple tasks.  T. 396.  The ALJ also acknowledged the GAF scores assigned by Dr. Duffy and Dr. Hirschorn and explained that the scores were disregarded because the ALJ considered GAF scores to be an "un-standardized and hypothetical continuum that is more of a snapshot of an individual's functioning."  T. 33.  The ALJ's findings in that regard are consistent with those of the Commissioner, who has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs" because GAF scores have no "direct correlation to the severity requirements of the mental disorders listings."  *See* 65 Fed. Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000).

Although the ALJ did not expressly address Dr. Duffy's and Dr. Hirschorn's observations of claimant's physical health, including the alleged gait disturbance, such findings were similar to those of Dr. Pugh, whose opinion was discounted because it was inconsistent with the medical record as a whole.  T. 390-93, 711-13, 925.  Indeed, contrary to Dr. Pugh's findings, substantial evidence in the record suggests claimant had full physical strength in all of her extremities.  T. 642-47. Medical notes from a July 18, 2012, visit to Baptist Hospital indicate plaintiff moved around with no difficulty and  had normal range of motion, gait, and muscle tone.  T. 882-83, 929-32.  To the extent the ALJ erred by not stating with particularity the weight given to the opinions of Dr. Duffy and Dr. Hirschorn, therefore, such error was harmless.

## CONCLUSION

In sum, while plaintiff had a myriad of complaints, there were few objective findings to support any of them and no objective findings, supported by medical evidence, that plaintiff was disabled in any way.  Indeed, the record is replete with instances in which plaintiff consulted a physician complaining of pain and discomfort in various parts of her body for which no cause could be identified.  Given the record in this case, the ALJ reasonably gave no weight to Dr. Pugh's opinion on the disabled driver parking application, assigned great weight to Dr. Dmytrenko's opinion on the Supplemental Impairment Questionnaire, and assigned great weight to Dr. Carter's opinion.  To the extent the ALJ failed to specify with particularity the weight given to Dr. Hirschorn's and Dr. Duffy's opinions, such failure is harmless error.  The undersigned thus finds the ALJ's decision supported by substantial evidence.

Accordingly, it is ORDERED:

1.   The decision of the Commissioner is AFFIRMED and plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income are DENIED.

2.  The clerk is directed to close the file.

DONE AND ORDERED this 18th day of September, 2015.


/s/ Charles J. Kahn, Jr.
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


Case No. 3:14cv359/CJK